HARRISON GRANITE CO. *v.* GRAND TRUNK RAILWAY SYSTEM.

1. CARRIERS—FREIGHT—BILL OF LADING—VALUATION — DAMAGES FOR NEGLIGENCE.
   In an action commenced by a granite quarrying company for damages in transit to a consignment of stone which defendant billed under a special and reduced rate upon plaintiff's representation, as shown in the receipt, that the stone was building granite and that the parties agreed upon a valuation in case of loss of 20 cents per cubic foot, although the material was intended for the construction of a mausoleum and was highly polished and more valuable than building stone; it appearing also that plaintiff acknowledged by the terms of the bill of lading that a higher rate was open to it without any restrictions as to valuation, the damages were correctly limited by the charge of the court to the valuation of 20 cents per cubic foot, as fixed in the contract of shipment.

2. SAME—ESTOPPEL.
   The shipper is estopped from recovering more than the agreed valuation in case the parties voluntarily contract as to the relative rate of transportation and value of the property; and except in cases of gross negligence on the part of the carrier the limitation of liability is effectual and valid.[1]

3. SAME—NEGLIGENCE—CONTRACTS LIMITING LIABILITY.
   Such limitation as to value has not such a tendency to exempt the carrier from liability for negligence as to bring the contract within the rule forbidding contracts of that class. BIRD, J., dissenting.

4. SAME.
   By the enactment of 34 U. S. Stat. 593 (U. S. Comp. Stat. Supp. 1911, p. 1307), Congress has assumed control of the subject of the liability of interstate carriers so as to supersede all State laws or regulations on that subject; under that statute contracts limiting the liability of the railroad to the agreed or declared value are valid.

[1] As to the effect of limitation of liability in receipt prepared by shipper, see note in 28 L. R. A. (N. S.) 645.

5. NEW TRIAL—MOTIONS—NEWLY DISCOVERED EVIDENCE.
Plaintiff's showing of diligence to excuse failure in securing newly discovered evidence for the trial, being insufficient, a new trial was rightly refused.

Error to Wayne; Rohnert, J. Submitted June 17, 1912. (Docket No. 112.) Decided May 28, 1913.

Case by the Harrison Granite Company against the Grand Trunk Railway System and National Dispatch Great Eastern Line for damage to a consignment of freight. The court directed a verdict against the Grand Trunk Railway System for less than the claimed damages. Plaintiff brings error. Affirmed.

*Smith, Baldwin & Alexander,* for appellant.

*L. C. Stanley,* for appellee.

STONE, J. The plaintiff and appellant is a Michigan corporation, having its home office at Adrian, its executive office at New York City, and its quarries at Barre, Vt. Its principal business is that of erecting vaults, mausoleums, and monuments.

In 1907 plaintiff and appellant had a contract for the construction of a large vault in a cemetery at Minneapolis, Minn., which required the shipment of 16 cars of stone from its quarries at Barre. On October 8, 1907, two cars were shipped over the Central Vermont Railway on Central Vermont cars; one car carrying 13 pieces and the other 6 pieces. It was the claim of the plaintiff that these cars were in a wreck on the Grand Trunk Railroad, and that 11 pieces of the granite were lost, and the other 8 pieces were damaged to such an extent that they were without value when they were delivered at Minneapolis, and were refused by the plaintiff. It was further claimed by the plaintiff, and there was evidence supporting such claim, that the total value of the granite shipped

175 MICH.—10.

on the two cars at Barre was $3,035.52, and the freight on the same, which was paid by the plaintiff, amounted to $336, and the expense of plaintiff's man at Minneapolis, waiting for the material to arrive, amounted to $537.37. There are two railroads at Barre, the Central Vermont Railway and the Montpelier & Wells River Railroad. The granite business is practically the only business at Barre, and from 40 to 60 car loads of granite are shipped over these two railroads daily. Before this shipment was made, plaintiff had considerable correspondence with the railroad companies in regard to rates, and a rate of 31 cents per hundred pounds from Barre to Minneapolis was finally agreed upon. This was made up of a rate of 18 cents from Barre to Chicago, and 13 cents from Chicago to Minneapolis.

The shipment moved from Barre to Chicago over the Central Vermont and Grand Trunk roads, and from Chicago to Minneapolis over the Chicago, Milwaukee & St. Paul. The Central Vermont Railway issued a shipping receipt, showing a through rate to be 31 cents per hundred. The shipping receipt contained the following, among other, provisions:

"It is mutually agreed, in consideration of the rate of freight hereinafter named, as to each carrier of all or any of said property over all or any portion of said route to destination, and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all conditions, whether printed or written, herein contained, and which are hereby agreed to by the shipper and by him accepted for himself and his assigns as just and reasonable." "The amount of any loss or damage for which any carrier becomes liable shall be computed at the value of the property at the place and time of shipment under this bill of lading, unless a lower value has been agreed upon, or is determined by the classification upon which the rate is based, in either of which events such lower value shall be the maximum price to govern such computation."

On this bill of lading there was stamped the following statement:

"The consignor of this property has the option of shipping same at a higher rate, without limitation as to value in case of loss or damage, but agrees to the specified valuation named, in case of loss or damage because of the lower rate thereby accorded for transportation.  H. G. Co., Shipper."

Also the following:

"No carrier's liability under the Western classification shipment fully released.  Valuation expressed by consignor not exceeding 20 cents per cubic foot."

The stone was described in the shipping receipt as "building granite."

The plaintiff claimed that the shipment, so far as the Central Vermont Railway was concerned, was made under commodity rates, which contain no restriction of valuation.  In support of this claim the plaintiff introduced in evidence a letter addressed to it dated August 17, 1909, signed by the general freight agent of the Central Vermont Railway Company, stating as follows:

"I beg to advise that so far as this company is concerned, the shipment to which you refer moved under commodity rates."

The defendant claims that this letter does not prove the fact claimed, and if treated as an admission, having been made long after the shipment, and not shown to be within the authority of the agent to make, it was not binding upon defendant.  It was undisputed that the above-quoted statement signed "H. G. Co., Shipper," was actually signed on the bill of lading by Mr. Russell, the plaintiff's superintendent and chief officer at Barre; that the bill of lading was made out by Mr. Russell and signed by the agent of the Central Vermont Railway Company.  It further appeared that the stones, after being polished, cut, and otherwise finished for putting into place in the vault at Minne-

apolis, were covered with one-inch boards, boxed throughout and banded with hoop iron, and some of them had 1½-inch plank fastened to the bottom for additional protection. This boxing was done in the shop of the plaintiff, and when done the stone was loaded onto the car upon a side track which runs through the shop, and when the car was loaded the railroad company was notified, and the car was sent for and hauled out. Some of the stones were highly polished to the same degree of polish that is put on monuments. Some of the polished surfaces were very large. One was 8 feet 1 inch by 14 feet 6 inches.

At the close of the plaintiff's evidence, the trial court directed a verdict and judgment for the plaintiff for $1,156.19, being at 20 cents per cubic foot for the stone lost and damaged, and also freight paid and expense of delay. The plaintiff asked to recover for the full value of the stone lost and damaged, also freight and expense by reason of the delay of the shipment. The plaintiff has brought the case here on writ of error.

The errors relied upon are:

(1) The ruling of the trial court holding that plaintiff's right to recover was limited to the restricted value of 20 cents per cubic foot for stone lost and damaged, freight and expenses, and directing the verdict for that amount, instead of for the full value of the stone lost and damaged, with freight and expenses. (2) In refusing to submit the case to the jury under proper instructions, and in refusing to instruct the jury as requested. (3) In refusing to grant plaintiff's motion for a new trial for the reasons stated in the motion.

The first two grounds of alleged error may well be considered together.

1. In determining whether or not plaintiff was bound by the clause stamped on the shipping receipt, restricting the value of the shipment to 20 cents per cubic foot, it becomes necessary to first determine un-

der what rate the shipment moved. It is the claim of the plaintiff that the evidence showed that the shipment was made under the commodity rate, and that, this being true, there could be no restriction of the value. We understand it to be the claim of the defendant that the shipment was made under the sixth class rate, and that before it was possible for plaintiff to ship under this rate it was necessary for it to fix the value of the stone at 20 cents per cubic foot, and that it was in consideration of this restriction that it was given the sixth-class rate. Much stress is laid by plaintiff's counsel upon the statement in the record made by defendant's counsel that "there is no restriction on the value of the commodity rate," and that none of the correspondence leading up to the contract mentioned "restricted valuations." It is further claimed by plaintiff that Barre takes the Burlington rate, and that by referring to the joint west-bound freight tariff, in evidence, it is found that the rate number of Chicago is 100. At page 21 of the commodity tariff, under No. 98, it appears that the shipments from Burlington points are governed by scale G, and by the same exhibit, under scale G and rate number 100, it is found that the rate is 18 cents per hundred pounds; and it is urged that at no other place will the rate of 18 cents on shipments of this nature between Barre and Chicago be found.

It is well, however, that we note what materials are embraced in No. 98. They are—

"Stone rough, or stone, building, common planed or sawed, dressed or rough dressed for building purposes (but not to apply to stone for monument or sarcophagus work), cobblestones, paving blocks, stone curbings, flagging, car loads. * * * Note: On stone including stone partly dressed or partly cut, for vault work, in car loads, 6th class rates apply."

On the first page of this commodity tariff are the words: "Governed by official classification."

It is claimed by the defendant that the plaintiff was not entitled to recover the full value of the stone lost and damaged, but was only entitled to recover on the basis on which the verdict was directed, namely, at the rate of 20 cents per cubic foot; that this question calls for a setting forth of the classification and tariffs providing for the shipment of "building granite," which was the name of the article used on the bill of lading. There is no doubt that this building granite was to be used for a mausoleum or vault. That fact is testified to by at least three of the plaintiff's witnesses, and is not disputed. In plaintiff's brief it is said that it had a contract "for the construction of a large vault in a cemetery at Minneapolis."

It appears from the record that there is an official classification to which the tariff known as the "class tariff" applies. In other words, all articles commonly made the subjects of transportation are classified according to weight, value, etc., into classes, first, second, third, fourth, fifth, and sixth; the first class being of the highest value, or most bulky in accordance with their value, the sixth class being of the lowest value, or least bulky in accordance with value. It also appears that commodity tariffs are issued, taking an article out of the regular class tariff, and treating it as a commodity by itself, usually, but not always, at a lower rate of transportation than is shown in the class tariff. It appears from the record that, in the official classification applicable from the point of shipment to the point of destination, marble or granite, meaning the rough stone, in car loads, when rated over sixth class, but not higher than fifth class, would take a rate of 16 cents per hundred pounds to Chicago. Also, that marble, granite and onyx in blocks or slabs, when chiseled, polished, or dressed, and boxed, should go at fourth class, in car loads when the consignor's valuation is not expressed, or when it is expressed as exceeding 40 cents per cubic

foot; and when such valuation is expressed at not exceeding 40 cents it goes at fifth class. It also appears that, when the value is not to exceed 40 cents per cubic foot, the statement which appears to be signed "H. G. Co., Shipper," on the bill of lading in this case, must be entered in full on the shipping order and bill of lading, and signed by the consignor.

It also appears from the tariff quotation in the record that when the marble, granite, or onyx is rough quarried, and the consignor's valuation is not expressed, or is expressed at exceeding 20 cents per cubic foot, it goes at fifth class, and when expressed as not exceeding 20 cents it goes as sixth class, with the requirement of the same notation on the bill of lading which is found on the bill of lading in this case. The record shows that the sixth-class rate to Chicago was 22 cents per hundred, or 4 cents more than this shipment paid to the Grand Trunk lines.

If this shipment had moved at fifth class, the rate would have been 26 cents to Chicago, and at fourth class it would have been 31 cents to Chicago.

It is the claim of the defendant that on this shipment, it having been stone fully cut for vault work, the sixth-class rate properly applied, and that this shipment should have paid to Chicago at the rate of 22 cents per hundred pounds instead of 18 cents; but taking into consideration the manner in which this granite had been boxed and covered, and the fact that it appears that the bill of lading had been filled up and prepared by the plaintiff's superintendent, and the term "building granite" had been inserted, the defendant was induced to ship at a lower rate; that the commodity rate should not have been used because it does not apply to granite vaults; that while the plaintiff may have got a commodity rate, it did not ship commodity property; that it shipped fifth or fourth class property, and the plaintiff put a stamp upon the

bill of lading which would have justified the acceptance of this property as rough quarried granite, sixth class, or granite for vault work, sixth class, but by reason of stating it to be building granite the plaintiff did better, and obtained a rate of 18 cents as though it had been building stone, common, plain rough, or rough dressed; that if there was anything knowingly illegal about this method of doing business, in which valuable granite was shipped as if it had been common stone, the· parties being in equal fault, the plaintiff is in no position to complain of the amount of the verdict.

It is the further claim of the defendant that the contract expressing the valuation was legal under the laws of Vermont, where it was made, and under the acts of Congress, and also under the laws of this State; that it is not an exemption from liability, but is a fair effort of the parties to ascertain the value to be put upon the property for shipping purposes; that the courts recognize the advantage of a value for shipping purposes, which may not be the same as the real value; that where, as in this case, the shipper has the option of shipping without restriction of value, no one is injured when he undertakes to save some freight by representing his property to be worth less; that it is done every day, and is simply a form of insurance; and that the plaintiff having effectually concealed the real nature and value of its property, for a pecuniary benefit to itself, will not be heard to say now that its contract was in any wise illegal. *Chicago, etc., R. Co.* v. *Kirby,* 225 U. S. 155 (32 Sup. Ct. 648).

In any just view of the case as made by the evidence, we are of opinion that the plaintiff is in no position to complain of the amount of the recovery. The representation or acknowledgment by the shipper that there is available to him a higher rate without restriction of valuation is sufficient proof of the fact, but in this case we have the language of the tariffs

giving that unrestricted opportunity. *Freeman* v. *Railroad Co.,* 138 Mo. App. 322 (122 S. W. 1).

The tendency of the courts is to give effect to these voluntary contracts of the parties in reaching an understanding concerning the relative rate of transportation and value of property reciprocally. The action of the shipper affects the action of the carrier.

Such arrangements are held to be entirely distinct from those other contracts which exempt the carrier from the consequences of his negligence. These are held to be an adjustment beforehand of the damages which may result from negligence; and for that reason such arrangements are held to be good except in the event of gross negligence of the carrier. See. *Louisville & Nashville R. Co.* v. *Sherrod,* 84 Ala. 178 (4 South. 29) ; *Graves* v. *Railroad Co.,* 137 Mass. 33 (50 Am. Rep. 282). In the last-cited case it was held that the shipper was estopped to recover more than the agreed valuation.

A leading case is that of *Hart* v. *Railroad Co.,* 112 U. S. 331 (5 Sup. Ct. 151), where it was held that the voluntary contract between carrier and shipper, in an effort to decide beforehand the extent of liability in the event of negligence, was a good contract, and was based upon good consideration; the consideration being the opportunity to ship at a lower rate than that called for by the unrestricted basis of shipment.

In *Atkinson* v. *Transfer Co.,* 76 N. J. Law, 608 (71 Atl. 278), the court said:

"Having taken advantage of the lower rate, * * * the shipper is estopped from afterwards asserting that the value is greater. To permit him to reap the benefit of a lower rate in case there is no loss, and to repudiate the valuation upon which that rate was based, if there be a loss, would be repugnant to every principle of fair play."

See, also, *Perrin* v. *Express Co.,* 78 N. J. Law, 515

(74 Atl. 462, 28 L. R. A. [N. S.] 645) ; *Pacific Express Co.* v. *Foley,* 46 Kan. 457 (26 Pac. 665, 12 L. R. A. 799, 26 Am. St. Rep. 107) ; *Humphreys* v. *Perry,* 148 U. S. 627 (13 Sup. Ct. 711) ; *Wunsch* v. *Railroad Co.* (C. C.), 62 Fed. 878.

That the connecting carrier is entitled to the benefit of the limitation of value, see *Mears* v. *Railroad Co.,* 75 Conn. 171 (52 Atl. 610, 56 L. R. A. 884, 96 Am. St. Rep. 192).

That this limitation as to value has no tendency to exempt from liability for negligence, see *Baltimore & Ohio R. Co.* v. *Hubbard,* 72 Ohio St. 302 (74 N. E. 214) ; *Alair* v. *Railroad Co.,* 53 Minn. 160 (54 N. W. 1072, 19 L. R. A. 764, 39 Am. St. Rep. 588).

The fact that the receipt is prepared by the shipper, containing a limitation as to value, is evidence of his freedom of contract and his choice of rates. Such a contract fixes the damages, and does not limit the carrier's liability, and is held not contrary to public policy. *Mering* v. *Southern Pacific Co.,* 161 Cal. 297 (119 Pac. 80) ; *George N. Pierce Co.* v. *Wells Fargo & Co.,* 189 Fed. 561, 110 C. C. A. 645.

There was no evidence of gross negligence of the defendant.

We are of opinion that the trial court did not err in directing the verdict and amount of recovery in the case, and there was no error in refusing to submit the case to the jury.

In *Adams Express Co.* v. *Croninger,* 226 U. S. 491 (33 Sup. Ct. 148), the United States Supreme Court decided, January 6, 1913, that the intent of Congress to take possession of the subject of the liability of a carrier under contracts for interstate shipment, and to supersede all State regulations with reference to that subject, so clearly appears from the Carmack amendment of June 29, 1906 (Act June 29, 1906, chap. 3591, § 7, 34 U. S. Stat. 593 [U. S. Comp. Stat. Supp.

1911, p. 1307]), as to invalidate, as applied to interstate shipments, the provisions of any State law nullifying contracts limiting the liability of a carrier for loss or damage to the agreed or declared value; and that a stipulation in a carrier's receipt, limiting its liability to an agreed or declared value, made to adjust the rate, is not forbidden by the provisions of the Carmack amendment that "no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company, from the liability hereby imposed."

2. What we have already said disposes of all the questions raised upon the motion for a new trial, except that of newly discovered evidence. The trial took place November 22, 1910. The record shows that as early as January 24, 1908, the plaintiff wrote a letter to the manager of the National Dispatch Great Eastern line stating that the two cars in question were wrecked at Trenton, Ontario, on the Grand Trunk Road, and on February 15, 1908, the said manager wrote the plaintiff to the same effect. It therefore appears that plaintiff had information or knowledge, as early as the first date above stated, that the cars were wrecked at Trenton, Ontario. An examination of the motion papers discloses that at Trenton all this information was in public records of an inquest, and that the plaintiff readily secured the same on going to that city soon after the trial. No excuse is shown for this delay, or want of diligence. We hardly need cite authorities to the effect that, in the absence of a showing of diligence, a new trial on account of newly discovered evidence is properly denied. *Burke* v. *Electric Co.*, 147 Mich. 172-177 (110 N. W. 524).

We find no reversible error in the record, and the judgment of the circuit court is affirmed.

Steere, C. J., and Moore, McAlvay, Brooke, and Ostrander, JJ., concurred with Stone, J.

BIRD, J. I am of the opinion that the contract in this case is a clear violation of the rule that a common carrier railway may not contract against its own negligence, and I concur therein only on the ground that the question is now controlled by the Federal law as construed in *Adams Express Co.* v. *Croninger*, 226 U. S. 491 (33 Sup. Ct. 148).