MISSOURI PAC. RY. CO. v. HARPER BROS.†

(Circuit Court of Appeals, Seventh Circuit. April 23, 1912.)

No. 1,796.

1. SIGNATURES (§ 4*)—BY HAND OF ANOTHER—CONTRACT OF SHIPMENT.
    Where the owner of live stock authorized another to ship the same, and an employé of such other in his presence signed the shipping contract, it was in legal contemplation signed by the owner, and is binding on him.
    [Ed. Note.—For other cases, see Signatures, Cent. Dig. § 6; Dec. Dig. § 4.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing denied December 24, 1912.

**2. CARRIERS (§ 62*)—CONTRACT OF TRANSPORTATION—VALIDITY.**

In the absence of fraud or mutual mistake, a shipper who is sui juris will not be heard to say that he did not read and understand his duly executed contract of shipment.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 195–206½; Dec. Dig. § 62.*]

**3. CARRIERS (§ 158*)—LIMITATION OF LIABILITY—VALIDITY OF CONTRACT.**

Neither the common law nor section 20 of the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 386 [U. S. Comp. St. 1901, p. 3169]), as amended by Act June 29, 1906, c. 3591, § 7, 34 Stat. 593 (U. S. Comp. St. Supp. 1907, p. 909), which makes an interstate carrier liable for loss or damage caused by it or a connecting carrier to property in shipment, and prohibits contracts exempting it from such liability, makes illegal or invalid a contract fairly entered into fixing the valuation of the property for which the carrier shall be liable in case of loss.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 663–667, 699–703½, 708–710, 718, 718½; Dec. Dig. § 158.*]

**4. CARRIERS (§ 135*)—LOSS OF PROPERTY IN SHIPMENT—ACTION—ATTORNEY'S FEES.**

The provision of section 16 of the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]), as amended by Act June 29, 1906, c. 3591, § 5, 34 Stat. 590 (U. S. Comp. St. Supp. 1907, p. 902), for an allowance to a shipper of an attorney's fee, applies only to suits based on orders of the Interstate Commerce Commission making awards for violation of the act, and does not authorize the allowance of such fees in an action for loss or damage to property in shipment.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 557–559, 599–602, 603; Dec. Dig. § 135.*]

In Error to the Circuit Court of the United States for the Eastern District of Illinois; Francis M. Wright, Judge.

Action at law by Harper Bros., a corporation, against the Missouri Pacific Railway Company. Judgment for plaintiff, and defendant brings error. Reversed.

Defendant in error, plaintiff below, alleged in its declaration that on February 10, 1910, it was the owner of 67 mules and 6 horses; that it delivered the animals in good condition to defendant to be transported on its railway from Conway Springs, Kan., to East St. Louis, Ill.; that through the negligence of defendant in operating its train 60 of the animals were killed, and the remainder were severely injured; that plaintiff thereby suffered damages in the sum of $25,000, and became entitled to its reasonable attorney's fees to be fixed by the court.

Defendant pleaded the general issue, tender, and certain special defenses based upon a written shipping contract. A demurrer to the latter was sustained on the ground that all the special defenses so pleaded were admissible under the general issue.

At the trial defendant introduced in evidence a "freight tariff," together with evidence of its having been filed with the Interstate Commerce Commission and posted in the freight office at Conway Springs. This tariff showed the rate on horses and mules by car load to be $72 from Conway Springs to East St. Louis, and contained the following with respect to "valuation of live stock": "The rates on live stock published in this tariff are based on the following valuations, which agents must be particular to see inserted in the live stock contracts: Each horse or pony (gelding, mare, or stallion) or jack, $100. * * * If owners or shippers are not agreeable to forwarding their stock subject to the above valuations, the rates will be increased 25 per cent. for each 100 per cent. or fraction thereof in excess of the above valuations." Defendant's offer of the written shipping contract, on plaintiff's objections,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

was rejected. This contract, covering the transportation at the rate of $72 a car, provided "that in case of total loss of any of the live stock covered by this contract from any cause for which the first party will be liable, payment will be made therefor on the basis of the actual cash value at the time and place of shipment, but in no case to exceed $100 for each horse," etc. Defendant proved tender of an amount sufficient to cover the value of the animals as fixed in the contract; but plaintiff recovered judgment for a much larger sum and was allowed attorneys' fees.

Further facts are stated in the opinion.

L. O. Whitnel, of E. St. Louis, Ill. (M. L. Clardy, of St. Louis, Mo., of counsel), for plaintiff in error.

Rudolph J. Kramer, Walter S. Louden, Edward C. Kramer, and Bruce A. Campbell, all of E. St. Louis, Ill., for defendant in error.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

BAKER, Circuit Judge (after stating the facts as above). Technical objections to the record and to the assignments of error are urged, but we find them to be without substantial merit. An examination of the record makes it clear, beyond cavil, that court and counsel fully understood that plaintiff's right to recover more than defendant had tendered depended on the admissibility and effect of the contract.

F. H. Harper, vice president of plaintiff, after purchasing the animals, left Conway Springs before the shipment was made. Prior to departing he told Henry Stayton, of Stayton Bros., to "ship them," and informed defendant's freight agent that Stayton Bros. would attend to shipping the animals. One Sanders, an employé of Stayton Bros., in the presence and at the direction of Henry Stayton, signed the shipping contract as follows: "F. H. Harper, shipper, by Stayton Bros."

[1] 1. Sanders' act in signing the contract in the presence and at the direction of Stayton was equivalent to Stayton's signing. And Stayton had been directed by Harper to "ship the animals." Shipment was therefore made, in legal contemplation, by F. H. Harper for the benefit of plaintiff. "The delivery to the carrier or his agent may be made not only by the shipper in person, but also by his authorized agent. Where the owner of goods places them in the hands of an agent to secure their transportation by a carrier, the latter, in the absence of a known limitation upon the agent's authority, is justified in considering the agent authorized to exercise all the powers necessary to effect the purpose of the agency, and the acts of the agent in that respect will be binding upon the principal, as in giving directions as to the time or manner of shipment or the terms and conditions upon which the transportation is to be undertaken." Hutchinson on Carriers (3d Ed.) § 108; Elliott on Railroads (3d Ed.) § 1408.

[2] 2. Illinois rulings (Wabash Ry. Co. v. Thomas, 222 Ill. 337, 78 N. E. 777, 7 L. R. A. [N. S.] 1041) that the carrier must prove, not only that the shipper signed the contract, but additionally that he understood and agreed to its terms, have been limited to intrastate shipments. Coats v. C., R. I. & P. Ry. Co., 239 Ill. 154, 87 N. E. 929.

201 F.—43

But at all events the Illinois rule would not control interstate transportation. In many businesses, like insurance and carriage, contracts are almost necessarily closed by the applicants' signatures to or acceptances of printed forms prepared by their adversaries; and transactions would be seriously impeded and might wellnigh be brought to a standstill if terms and conditions had first to be discussed and agreed on with each applicant, and then be reduced to writing and signed. Remedies would seem to be best sought in legislative control of the terms of policies, bills of lading, and the like. But in courts the general rule, applicable here, should be maintained, that, in the absence of fraud or mutual mistake, a person sui juris will not be heard to say that he had not read and understood his duly executed contract. Cau v. T. & P. Ry. Co., 194 U. S. 427, 24 Sup. Ct. 663, 48 L. Ed. 1053; Hutchinson on Carriers (3d Ed.) §§ 408–9.

[3] 3. Was the contract rejectable on the ground that it would be without effect under either the common law or section 20 of the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 386 [U. S. Comp. St. 1901, p. 3169])?

1. At common law a carrier of goods is virtually an insurer of safe delivery; but his right by contract to eliminate insurance and to be liable only for negligence is thoroughly established. To go further and seek by stipulation, though based on the consideration of lower rates, to escape liability for negligence, is strictly denied. Rld. Co. v. Lockwood, 17 Wall. 357, 21 L. Ed. 627. And if liability for negligence cannot be avoided by a deliberate contract to that effect, the logical consequence is that no fractional part of such liability can be escaped. That is, a carrier cannot negligently destroy $200 worth of goods and hold the shipper to a contract that the carrier shall respond for only half the value, even though the contract expressed their mutual intent, and was founded on a full consideration. But from very early times value has been recognized as a legitimate element in rate-making. "The reward ought to be proportionable to the risque." Gibbon v. Paynton, 4 Burrow, 2298. And so, if a valuation of goods is made in good faith, whether proposed by the shipper or by the carrier, and if the rate is based on such valuation, the agreed value is the measure, not of the liability for the loss, but of the amount of the loss. In the precedents that must be accepted by us as controlling we have found no departure from the principle laid down in Hart v. Pennsylvania Rld. Co., 112 U. S. 331, 5 Sup. Ct. 151, 28 L. Ed. 717:

"The limitation as to value has no tendency to exempt from liability for negligence. It does not induce want of care. It exacts from the carrier the measure of care due to the value agreed on. The carrier is bound to respond in that value for negligence. The compensation for carriage is based on that value. The shipper is estopped from saying that the value is greater. The articles have no greater value, for the purposes of the contract of transportation, between the parties to that contract. The carrier must respond for negligence up to that value. It is just and reasonable that such a contract, fairly entered into, and where there is no deceit practiced on the shipper, should be upheld. There is no violation of public policy. On the contrary, it would be unjust and unreasonable, and would be repugnant to the soundest principles of fair dealing and of the freedom of contracting, and thus in con-

flict with·public policy, if a shipper should be allowed to reap the benefit·of the contract if there is no loss, and to repudiate it in case of loss.

\*    \*    \*    ·\*    \*    \*    #    \*    \*    · #

"The distinct ground of our decision in the case at bar is that where a contract of the kind, signed by the shipper, is fairly made, agreeing on the valuation of the property carried, with the rate of freight based on the condition that the carrier assumes liability only to the. extent of the agreed valuation, even in case of loss or damage by the negligence of the carrier, the contract will be upheld as a proper and lawful mode of securing a due proportion be- . tween the amount for which the carrier may be responsible and the freight he receives, and of protecting himself against extravagant and fanciful valuations."

In George, N. Pierce Co. v. Wells Fargo & Co., 189 Fed. 561, 110 C. C. A. 645, the Circuit Court of Appeals for the Second Circuit applied the Hart Case to a shipment of a car load of automobiles, of the evident value of at least $15,000, under a bill of lading in which the property was valued at the lump sum of $50. One of the judges dissented on the ground that, on the face of the transaction, $50 could have no real relation to the value of a car load of automobiles, that the purported valuation was not "fairly made" as in the Hart Case, but was wholly fictitious; in short, that the stipulation was inserted, not as the measure of the amount of the loss, but as a limitation upon the liability for the loss. In the present case such an attack cannot prevail, for we are unable to say on the face of the transaction and without extrinsic evidence that $100 has no fair relation to the average value of horses, highly· and lowly bred, sound and unsound, vigorous and decrepit, in the territory for which the defendant had based its primary rate on that valuation. And, if extrinsic evidence were to, be received, it would have to go to the extent of warranting a conclusion that the disparity in that territory between $100 and the fair average value of horses was so great that the carrier intended, not a fair valuation as an element in rate-making, but a shield against its full liability for negligence. And if the carrier's primary offer of valuation and rate was made fairly and in good faith, the fact that the shipper, in accepting the rate, had mental reservations respecting average value or the value of his particular shipment would be irrelevant. And if the increase of rates above the primary rate, for valuations above the primary valuation, was disproportionate to the increase of risk and service, a subject-matter would appear which might well be brought before the Interstate Commerce Commission, but which would have no place in litigation over a past transaction unless evidence should be forthcoming to prove that the disproportionate increase had been adopted and used to coerce shippers into accepting the primary valuation and rate.

2. A part of section 20 of the Interstate Commerce Act, as amended (U. S. Comp. St. Supp. 1907, p. 909), reads as follows:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such com-

mon carrier, railroad, or transportation company from the liability hereby imposed: Provided, that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law."

Plaintiff's contention is that this provision abrogates the common-law rule respecting valuation. We are unable to find any new "liability hereby imposed" except that the initial carrier shall be liable for the actionable conduct of connecting carriers. Liability for loss through negligence is stated in the statute as the rule stood at common law: There can be no exemption from such liability. But full liability for negligence and a fairly made valuation of the property are separate matters; and the statute's adoption of the common-law rule as to liability does not in and of itself indicate a disapproval of the common-law rule as to valuation. If the Congress ever undertakes to eliminate value as a lawful element in rate-making, we have no doubt that the intention will be unmistakably expressed.

[4] 4. Allowance of attorney's fees was unauthorized. Provision for fees in section 16 of the Interstate Commerce Act applies only to cases before the Interstate Commerce Commission. It has no relation to actions in court.

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.