Idaho Sheep Co. v. Oregon Short Line R. Co., 188 Ill. App. 591.

# Idaho Sheep Company, Appellee, v. Oregon Short Line Railroad Company, Appellant.

## Gen. No. 18,308.

1. CARRIERS, § 60*—*when delivery of bill of lading passes title.* Delivery of a bill of lading with intent to transfer the property in the goods is a symbolical delivery of the goods and·passes a valid title thereto.

2. CARRIERS, § 43*—*when liability for shipment becomes fixed under Carmack Amendment.* Under the Carmack Amendment to section 20 of the Interstate Commerce Act, it is the receiving of the goods for transportation to a point in another State that fixes the carrier's liability for damage or loss caused by itself or by any connecting carrier; the carrier cannot defeat its liability by neglecting or refusing to issue a receipt or bill of lading in compliance with the act.

3. CARRIERS, § 139*—*proof essential to show right of action for damage to shipment.* In an action against a carrier to recover for loss or damage to a shipment, where the evidence shows a bill of lading was issued, it devolves upon the plaintiff to prove that he is the legal holder of the bill of lading; but where no such bill of lading was issued, ownership of the goods or the right to maintain the suit must of necessity be proved otherwise.

4. CARRIERS, § 50*—*nature of bill of lading.* A bill of lading is both a receipt and a contract to carry.

5. CARRIERS, § 107*—*when oral evidence of a contract of shipment should be excluded.* In an action against a carrier for damages resulting from a delayed shipment, where it was disclosed that plaintiff had signed a contract of shipment but the contract was not produced in court or its absence accounted for, and the plaintiff sought to rely wholly upon a verbal contract entered into prior to the signing of the written one, *held* that the court erred in overruling a motion at the close of the evidence to exclude all the oral evidence of the contract, on the ground that the contract itself was the best evidence and the only contract in the case.

6. CARRIERS, § 159*—*power of carrier to limit liability under Carmack Amendment.* The Carmack Amendment to section 20 of the Interstate Commerce Act does not prohibit a carrier from making a fair, open and reasonable agreement specifying a time in which a shipment may be delivered and limiting the amount recoverable by the shipper.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

592    APPELLATE COURTS OF ILLINOIS.

Idaho Sheep Co. v. Oregon Short Line R. Co., 188 Ill. App. 591.

7. CARRIERS, § 110*—*measure of damages for delayed shipment.* Unless otherwise legally limited by the contract to carry, the measure of damages by reason of a delayed shipment is the difference between the market value of the consignment at the time and in the condition it should have arrived and its fair, cash market value in the condition and at the time it actually did arrive at destination, plus the necessary expense to the shipper caused by the unusual delay.

8. CARRIERS, § 235*—*when not liable for damages resulting from stopping shipment of stock.* Where a carrier is already liable for damages resulting from delay in a shipment of lambs, it cannot be required to take the risk of further damages by stopping the shipment before reaching destination for the purpose of feeding the lambs for a future market, but where the shipment is thus stopped the carrier is entitled to the benefit of any reduction of the actual loss to the shipper that might thereby be occasioned.

9. CARRIERS, § 248*—*sufficiency of proof for an estimate of damages resulting from delayed shipment of stock.* In an action against a carrier for damages resulting from a delayed shipment of lambs where, owing to the delay, the shipment was stopped en route to be fed for a future market and later shipped to the original destination and sold, *held* that the proof in the record was too indefinite for an accurate estimate of the proper damage, and in view of a new trial the character of the proof and method of computation was suggested.

Appeal from the Municipal Court of Chicago; the Hon. HOSEA W. WELLS, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1912. Reversed and remanded. Opinion filed October 7, 1914.

DAVIS & RANKIN, for appellant; EDMUND P. KELLY, of counsel.

CHARLES A. BUTLER, for appellee.

MR. JUSTICE DUNCAN delivered the opinion of the court.

Idaho Sheep Company prosecuted this suit against appellant, Oregon Short Line Railroad Company, as the initial carrier in an interstate shipment of 2,994 lambs from Soda Springs, Idaho to Chicago, and recovered a judgment of $3,099.86.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Appellant in August, 1906, agreed to deliver by October 4, 1906, at Soda Springs cars for said shipment of lambs by appellee, but failed to deliver the same until November 7, 1906. By reason of said failure appellee caused the lambs to be removed from the range in Idaho and placed in pastures, cared for and fed, pending shipment, at an extra expense to it of about $300. The lambs were routed, loaded and shipped by appellee at Soda Springs by way of appellant's road to Chicago, November 7, 1906, in good, fat condition and weighing on an average about 67 pounds per lamb. All the lambs arrived at Kirkland, Illinois, November 16, 1906, about ten o'clock, P. M., after a continuous run of almost forty hours from the last previous stop and rest, looking tired and gaunt, none of them killing lambs, and weighing not exceeding 58 pounds per lamb. Had they continued right along with the proper stop, rest and feed at Kirkland, they would have arrived in Chicago, November 19th or 20th, weighing on an average about 57 pounds, all of them feeders and none of them killing lambs, and 500 of them would have sold on the Chicago market at those times at $6.10, and the others at $6.60 per cwt. They were in good, fat condition for the market from October 4, 1906, to October 19, 1906, and at those times weighed 70 lbs. per head. Had they been shipped October 4th and properly cared for en route and promptly delivered ninety per cent. of them would have been delivered in Chicago as good Idaho, well-bred, killing lambs weighing 65 lbs. per lamb on an average, and ten per cent. thereof would have been delivered as good, well-bred, Idaho feeders weighing about 65 lbs. per head. Had they been so shipped October 19th, and so cared for, they would have been delivered in Chicago, seventy-five per cent. thereof as killing lambs and twenty-five per cent. thereof as feeders, and weighing near 65 lbs. per lamb. The usual time in transit for such shipments from Soda Springs to Kirkland and

from Soda Springs to Chicago is about seven and eight days respectively, and the usual shrinkage for the eight days in transit is about 5 lbs. per head when properly cared for and fed. The cash market value in Chicago of Idaho killers, such as the lambs in question, was on October 12, 1906, $7.65, and on October 16th, $7.55 per cwt. The cash market value in Chicago of such lambs as feeders on October 12th was $6.60, and at any time from October 12, 1906, to February 28, 1907, such feeders would not have sold for more than $6.75 per cwt. The lambs were badly treated en route by being stopped and fed at some stops with very poor feed in very muddy pens and were given bad water, and at times in troughs too high for the lambs to drink from, and thereby they lost heavily in flesh; and a number of other lambs died en route, but they were not included in the statement of claim. Appellee had the lambs all placed on good pastures at Kirkland, November 17, 1906, and as soon thereafter as it was safe to do so they were put on good feed there and fattened for the market, and as rapidly as they became killing lambs they were promptly shipped to Chicago and sold as killers from January 27th to February 27, 1907, except a few dead and cripples. They weighed on an average near 82 lbs. per lamb with their increase in growth and flesh. The 2,994 lambs were all sold at from $7.40 to $7.70 per cwt., except the crippled, dead and other objectionable ones that sold at from 50 cents to $4 per head. The lambs were brought to Chicago on the same billing on which they left Soda Springs; and the gross proceeds of the sales thereof amounted to $18,196.04. The total expense therefor for care, feed and pasture at Kirkland was about $5,842.75.

Appellee alleged and claimed damages for the failure of appellant to safely carry and deliver the lambs within a reasonable time after receipt thereof, and for its failure to furnish cars and to safely deliver the

lambs in good order and condition as it agreed to do.

Appellant entered a general denial, and averred that appellee was a foreign corporation without a license, was transacting and had transacted its business in this State without a license and, therefore, could not maintain its suit, but in its argument has abandoned its affirmative defense.

In addition to the undisputed facts above recited, R. W. Phillips, agent of appellee in making the shipment at Soda Springs, testified, without contradiction, as follows:

"After loading the sheep I told Mr. Strahan, depot agent of appellant, to bill these sheep to the Knollin Sheep Co., Chicago, and gave him the routing. He gave me a contract to sign after that conversation. I signed it 'Idaho Sheep Co.' by myself. I got a copy of it and it was given to my men that accompanied the sheep (to Kirkland). He (Strahan) signed them and kept a copy and gave me one. I made no objections to signing it. I don't know of ever reading one of them word for word. I know in a general way the contents of that document I signed November 7th, and had at that time."

This suit is controlled by that portion of the Carmack Amendment to section 20 of the Interstate Commerce Act, which provides as follows:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one State to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed: Provided, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law."

The said act declares the initial carrier's liability for loss and damage to interstate shipments, and that legislation supersedes all regulations and policies of any particular State upon the same subject. The proviso above quoted related to remedies existing under Federal law and not to any State law. *Adams Exp. Co. v. Croninger*, 226 U. S. 491.

The right of action is in positive terms of said amendment given to the lawful holder of the receipt or bill of lading, and it requires the carrier to issue the same. These provisions are sound and simple and need little or no explanation. The owner of the bill of lading was regarded in law as an owner of the goods or the thing shipped before the Carmack Amendment was ever enacted. The lawful holder of the bill of lading, even by assignment or by mere delivery thereof with intent to transfer the goods, has at all times been regarded as having the right to the possession of the goods shipped, and property rights therein according to the intent of the parties to the assignment or delivery, and could maintain an action for the possession of the same. Delivery of a bill of lading with intent to transfer the property in the goods is a symbolical delivery of the goods and passes a valid title thereto. *Lewis v. Springville Banking Co.*, 166 Ill. 311; *Michigan Cent. R. Co. v. Phillips*, 60 Ill. 190; *Peters v. Elliott*, 78 Ill. 321; *Taylor v. Turner*, 87 Ill. 296.

It is the receiving of the goods for transportation to a point in another State, however, that fixes the carrier's liability under the Carmack Amendment for damage or loss caused by itself or by any connecting carrier. It cannot defeat its liability by neglecting or refusing to issue a receipt or bill of lading in compliance with that act. *Gamble-Robinson Commission Co. v. Union Pac. R. Co.*, 262 Ill. 400; *Atlantic Coast Line R. Co. v. Riverside Mills*, 219 U. S. 186; *International Watch Co. v. Delaware L. & W. R. Co.*, 80 N. J. Law 553.

If a bill of lading, however, is issued by the carrier, as the said act requires, the lawful holder thereof is the one given the right of action for loss or damage as aforesaid; and if the existence of such a bill of lading is shown it will devolve upon the plaintiff to prove that he is the legal holder thereof. Where no such bill of lading is issued, ownership of the goods or right to maintain the suit must of necessity be proved otherwise, but the carrier in such case cannot defeat the suit by the showing that no such bill of lading or receipt was issued.

A bill of lading is both a receipt and a contract to carry. *Merchants' Despatch Transp. Co. v. Furthmann*, 149 Ill. 66.

The evidence in this case tends to prove that a bill of lading was issued by appellant for the lambs shipped by appellee, but there is no evidence as to its contents and it does not appear in the record who was the legal holder of it at the time the suit was brought. It positively and clearly appears from the record that appellee and appellant signed a written contract, and presumably a contract to carry the lambs. That contract was not produced in court or its absence accounted for, but appellee sought to rely wholly upon the verbal contract or undertaking with appellant with reference to said shipment entered into by them prior to the signing of the written contract.

When the evidence disclosed that there was a bill of lading, or a written contract to carry, entered into by the parties, appellant moved to exclude all the oral evidence of a contract to carry the lambs on the express grounds that the said contract itself was the best evidence thereof and the only contract in the case. The court overruled the motion, stating, in substance, that the evidence did not show that there was a written contract, and in that ruling the court erred. The motion was made at the close of all the evidence to exclude the evidence in the record and to instruct

the jury to return a verdict of not guilty, and that motion was overruled and proper exceptions preserved by appellant to said rulings.

The burden was upon appellee to prove the contract upon which the shipment was made by proper and legitimate evidence, by the best evidence of which the case was susceptible. There can be no question that the best evidence of a written contract is the writing itself. The bill of lading when signed by the parties is the evidence of the contract. *Gamble-Robinson Commission Co. v. Union Pac. R. Co., supra.*

When the motion is made to exclude all the evidence and to direct a verdict at the close of the evidence, the question for the court then is, is there any legal evidence in the whole record which tends to prove the material allegations of the declaration, or the ultimate facts necessary to establish the plaintiff's case. If so, the case should be submitted to the jury. If not so, then the court should direct a verdict for the defendant. *Libby, McNeill & Libby v. Cook,* 222 Ill. 206.

The right to have that question reviewed in this court cannot be said to be waived by appellant by failing thereafter to object to an instruction as to the measure of damages.

Moreover, appellee has placed itself in the attitude of suing on a verbal contract to carry that had no existence. The written contract superseded the oral contract, and is the only contract between the parties. It was bound to rely on the written contract for recovery when the evidence disclosed its existence, and was bound to produce it, or account for its loss or appellee's inability to produce it, and prove its contents by oral evidence. *Kitza v. Oregon Short Line R. Co.,* 169 Ill. App. 609, and cases there cited; *Burtless v. Oregon Short Line R. Co.,* 180 Ill. App. 249.

It is argued by appellee that the Carmack Amendment prohibits the carrier from exempting itself against the liability thereby imposed by contract, re-

ceipt, rule or otherwise and that, therefore, it can make no difference as to what was contained in the contract. We cannot accede to this view. The carrier cannot exempt itself from liability for its own negligence or that of its employees, but it can by a fair, open and reasonable agreement specify a time in which the shipment may be delivered and limit the amount recoverable by the shipper without violating that act. *Adams Express Co. v. Croninger, supra; Chicago, B. & Q. Ry. Co. v. Miller,* 226 U. S. 513; *Chicago, St. P., M. & Q. Ry. Co. v. Latta,* 226 U. S. 519; *Kansas City Southern Ry. Co. v. Carl,* 227 U. S. 639.

Appellee is shown by the evidence to have known the substance of its contract, and under the decisions of the Federal Courts that govern this case it is presumed to know the provisions thereof, and the presumption must be indulged that it was a binding contract. *Kansas City Southern Ry. Co. v. Carl, supra; Great Northern Ry. Co. v. O'Connor,* 232 U. S. 508; *Missouri Pac. Ry. Co. v. Harper Bros.,* 121 C. C. A. 570, 201 Fed. 671.

There is much argument concerning the proper measure of damages, and the court's instructions thereon. No correct rule can be given until appellee has presented its case under its contract. Unless otherwise legally limited by the contract to carry, the measure of damages by reason of a delayed shipment is the difference between the market value of the consignment at the time and in the condition it should have arrived and its fair, cash market value in condition and at the time it actually did arrive at its destination (or in this case when it would have arrived had it continued right on after proper rest at Kirkland), plus the necessary expenses to the shipper caused by the unusual delay. Appellant in this case could not be required to take the risk of further damages by stopping the shipment at Kirkland and feeding the lambs to make them killers for a future market, in case that caused a greater loss. But inasmuch as they were

stopped and fed for a future market by appellee, appellant would be entitled to the benefit of any reduction of the actual loss to appellee that might thereby be occasioned, as appellee could not recover more than his actual loss and damage.

As the case must be retried, we further suggest that the proof in this record is too indefinite for an accurate estimate of the proper damages, even supposing that under the contract the measure of damages above suggested shall properly apply. The actual number of lambs and sheep shipped by appellee November 7th was about 5,200, 3,675 of which were lambs, 560 of which seem to have been sold en route, and about 121 lambs appear to have died en route. Appellee sued for loss and damage to only 2,994 lambs and cannot under his statement of claim recover for more than that number. The evidence should accurately show the necessary expenses incurred by appellee for the lambs sued for while waiting for the delivery of the cars for shipment after October 4th. It should also show what the 500 would have averaged in weight on the market that would have sold as feeders on the market at $6.10, and also what the others would have averaged in weight that would have sold for $6.60 as feeders, on November 19th. In fact, when average weight of all the lambs is proved for any time, it should be of the 2,994 sued for and not of the 3,675. Then after obtaining the amount of damages on the supposition that they were sold on the market November 19th and 20th, as feeders, those damages should be mitigated further by any gain, if any, over the market of November 19th and 20th by feeding them and selling them as killers in January and February, 1907. In ascertaining that gain, if any, from the total proceeds of sales of the lambs, $18,196.04, less $5,842.75 expenses, should be deducted the proceeds of sales of the lambs that would have been realized had they been sold November 19th and 20th. This result

might be still varied, and apparently should be varied, by considering the fact that had the lambs been properly rested, watered and fed at Kirkland, and then have continued right along to Chicago, it would have been at an additional expense to appellee for such watering and feeding, the probable amount of which was not proved. In other words, that amount should be deducted from the supposed sales of November 19th or 20th to ascertain the amount appellee would have realized on such sales.

For the errors indicated the judgment of the court is reversed and the cause remanded.

*Reversed and remanded.*